Order of Solon, for use of R. F. Dulany, v. Andrew Gunther. Appeal of D. J. James, lien creditor.

*Sheriff's sale — Distribution—Election of funds—Relief of junior lien creditor.*

The court will not intervene to delay distribution in favor of a paramount creditor, at the instance of a junior creditor, until the paramount creditor shall proceed upon his security and raise another fund by the sale of another property, when such application was not made before the sale of the property doubly charged, and when the relief sought would subject the paramount creditor to delay and possibly to loss.

*Equity—Marshaling assets — Rules governing election of funds—Rights of paramount creditor.*

The rule that a party having two funds to satisfy his demands shall not by his election, disappoint a party who has only one fund is never enforced to defeat a superior or even equal right of another.

Where both funds are in court or under its control, the enforcement of this equity cannot, ordinarily, work injury to the paramount creditor, but where the proposition is to suspend distribution of a fund in the grasp of the courts until another fund shall be created, the burden of proof is cast upon the junior creditor, who invokes the extraordinary exercise of power, to show that the paramount creditor will not suffer loss by the delay.

Argued April 26, 1898. Appeal, No. 165, April T., 1898, by D. J. James, lien creditor, from decree of C. P. No. 1, Allegheny Co., Sept. T., 1897, No. 235, in distribution of proceeds of sale of mortgaged premises. Before RICE, P. J., WICKHAM, BEAVER, REEDER, ORLADY, SMITH and PORTER, JJ. Affirmed.

Exceptions to special return of sheriff, reporting schedule of distribution of proceeds of sale of mortgaged premises. Before SLAGLE, J.

The facts sufficiently appear from the opinion of the court below, as follows :

Upon the above writ certain real estate of defendant was sold by the sheriff, who made a special return by which he appropriated sufficient to pay the debt and costs of this writ in full, and also the debt and costs of a judgment in favor of

John Miller, at No. 351, September term, 1894, and the balance, $1,927.57, on account of a mortgage held by R. F. Dulany. On October 5, 1897, David J. James filed a petition alleging that he was a creditor of defendant, having a mechanic's lien upon a portion of the premises; that the said Dulany had a lien on other property praying, for subrogation, and a supplemental petition was filed asking that he should be compelled to exhaust the other property upon which he had a lien before resorting to the funds derived from the lots upon which petitioner had a lien. To these petitions answers were filed by all the parties interested denying that in any event he was entitled to the relief sought, one setting up the fact that the mechanic's lien under which he claimed was filed in court of common pleas, No. 3 ; that its validity was denied and a proceeding was then pending to have it stricken from the record. An agreement was filed by which the validity of the lien was to be determined by the court. This is therefore the first question presented for consideration. The objection to this lien is that it is filed as an apportioned claim for the construction of two tenements, whereas the work done was in the repair of one building which had been partially destroyed by fire. Considerable testimony was taken as to this fact which was submitted to the court to find the character of the building and determine the validity of the lien. From the testimony in the case it appears that the building, as originally constructed, was a single building with an ordinary roof presenting a gable front and rear, a single roof covering the whole. It was divided into two tenements, separated by a solid partition in the first and second floors, the attic covered by the common roof was unfinished and not used with either tenement. The separation of the tenements by a solid partition would justify the filing of an apportioned claim. This building or buildings was partially destroyed by fire. The eastern portion was burned to the foundation, the roof was almost wholly destroyed, leaving six or seven feet of the western side which was not used in the reconstruction. The partition was destroyed and a portion of the floors and weatherboarding. The plaster was destroyed by water where not burned. The petitioner rebuilt this house. The eastern portion was entirely new. In the western portion he put in a new partition between the two, replaced a portion of the floors and

walls, put on an entire new roof, it being a mansard divided into four rooms, two to each tenement, divided by new partitions, built a new porch in the rear, and plastered and painted the entire building.

We are of the opinion that this was a new building, which entitled the petitioner to a lien under the act of 1836, for the erection and construction of a building which might be properly apportioned: Trickett on Liens, sec. 6. We then come to the consideration of the rights of the petitioner against the other creditors and parties interested, and especially against R. F. Dulany, whose mortgage he asks to have subordinated to his claim. Andrew Gunther was the owner of several lots of ground in the borough of Rankin, Allegheny county, as follows: lots Nos. 99, 100, 146, 147, 148, 149 and 150 in Hartwood's plan and No. 28 in Hawkins's plan. In two of the answers filed it is stated that he owned other property in said county, but it is not specified, and there is no evidence of that fact submitted. It is possibly not material to the question under consideration. On May 21, 1896, the petitioner commenced the construction of the buildings before mentioned, upon Nos. 99 and 100, against which he filed his lien, in C. P. No. 3 at No. 24 of May term, 1897, for $847. On May 21, 1896, this property was subject to liens as follows:

On lots Nos. 99, 100, 146 and 147, mortgage to the Order of Solon for about $1,350, assigned to R. F. Dulany, December 5, 1892.

On lots Nos. 148, 149 and 150, mortgage to Alex. Dempster for about $1,650, December 6, 1892.

On all the lots, except No. 28, judgment of John Miller, at No. 351, September term, 1894, for $300, entered August 20, 1894.

Mortgage to R. F. Dulany for $2,950, August 28, 1895, being a first lien on lot No. 28, and a second lien on all the other lots.

On all the lots, judgment of Order of Solon, at No. 367, December term, 1895, for debt secured by the mortgage entered November 19, 1895.

Judgment of Allen Kirkpatrick & Co., at No. 191, January term, 1896, C. P. No. 2, for $560, entered December 5, 1895.

Judgment of R. F. Dulany, at No. 192, May term, 1896,

C. P. No. 3, for $2,800, entered March 19, 1896, being for the same debt secured by his mortgage.

The lien of the petitioner attached May 21, 1896.

After this date judgments were entered in favor of Alex. Dempster, at No. 158, January term, 1892, C. P. No. 2, for debt secured by his mortgage.

In favor of Wm. H. Gunther, for $915, at No. 305, September term, 1897, entered August 14, 1897.

And last, a judgment in favor of David J. James, at No. 20, October term, 1897, C. P. No. 2, for $893, the same debt for which his lien was filed. Entered August 27, 1897.

Upon the Order of Solon mortgage, a scire facias was issued at No. 815, June term, 1897; judgment obtained June 18, 1897, for $1,331.73, upon which a levari facias was issued, and lots Nos. 99, 100, 146 and 147 were sold by the sheriff on September 10, 1897. Lots Nos. 146 and 147 were first sold for $1,500, and lots Nos. 99 and 100 for $2,250. On the same day lots Nos. 148, 149 and 150 were sold upon an execution issued by Wm. H. Gunther, upon his judgments, at No. 305, September term, 1897. These lots were sold subject to the mortgage of Alex. Dempster, for $162. It does not appear to whom these lots were sold, or what disposition was made of the proceeds. On the next day, lot No. 28 was sold on the same writ to Mary Gunther, wife of the defendant, subject to the mortgage of R. F. Dulany, for the sum of $425. The purchase money was paid September 23, 1897, but no return has been made so far as was shown. Mrs. Gunther alleges that the purchase money was her own and there was no evidence offered to the contrary. On October 5, 1897, the petitioner notified Mrs. Gunther that he would make the application for subrogation now presented. It will thus appear that at the time the petitioner's lien attached, there were special liens upon lots Nos. 99, 100, 146 and 147, in favor of the Order of Solon, and on lots Nos. 148, 149 and 150, in favor of Alex. Dempster, and general liens upon all the lots in favor of John Miller, R. F. Dulany, the Order of Solon and Allen Kirkpatrick & Co., in the order named. These liens so stood when the sheriff's sale was made. By the special return of the sheriff of the proceeds of the sale of lots Nos. 99, 100, 146 and 147, the judgment of John Miller was paid in full, as was also the claim of the Order

of Solon. No exception was taken as to this distribution, and by agreement the special return was confirmed and the money paid to these parties. They are, therefore, not interested in this matter. The judgment of Allen Kirkpatrick & Co. was divested by the sheriff's sale of all the lots, and their claim would be against the proceeds of sale of lots Nos. 28, 148, 149 and 150. So that it does not appear that they are affected by this matter. The only parties now interested are R. F. Dulany and Mrs. Gunther, and the rights of petitioner are to be determined as against them. It is, therefore, necessary to inquire as to what rights they have and how they will be affected by the action now asked by petitioner. At the time petitioner's lien attached, and at the time of the sheriff's sale, R. F. Dulany owned a mortgage which has a first lien on lot No. 28, and a second or rather a third lien on lots Nos. 99, 100, 146, 147, 148, 149 and 150 and, by virtue of his judgment, a general lien on all these lots. The debt secured by these liens was for purchase money of lot No. 28, and it is argued that this fact makes that lot primarily liable for the debt and gives to the petitioner some special equity to demand that it be first exhausted before resorting to the other property. We cannot see the force of this argument. There is nothing in law or morals which prevents a vendor of real estate from taking other security for purchase money. In fact, it is an almost invariable rule to so do. Often a judgment note is taken, which may be enforced against all the vendee's property, but even a common bond or other contract for payment pledges all the resources of the vendee. We cannot see how the mortgaging of other property differs in principle. It is merely a security, and only differs from the other obligations in the mode of enforcing it. There is no allegation of fraud in this transaction, and Mr. Dulany's claim must, therefore, stand as a valid lien against all of Gunther's property and be treated as such.

What, then, are his rights as against R. F. Dulany? Lots Nos. 99, 100, 146 and 147 were sold on the writ of the Order of Solon. It was then owned and controlled by Dulany. Lots Nos. 148, 149 and 150, and also lot No. 28, were sold on the writ of Wm. Gunther; and so far as appears, this writ was not controlled by Mr. Dulany. On the Order of Solon mortgage no other lots could have been sold than the four covered by it.

Nos. 146 and 147, upon which the petitioner did not have a lien, were first sold, and afterwards the lots against which he claimed a lien. The lots were all sold on writs which passed a valid title to the lots respectively, and divested all liens, except the Dempster mortgage, on lots Nos. 148, 149 and 150, and the Dulany mortgage. The liens were thus transferred to the fund, and the rights of the parties must be ascertained as against it or growing out of its distribution. The distribution made by the sheriff was strictly in accordance with law. The mortgage of Dulany was the third lien on lots Nos. 99, 100, 146 and 147, and was therefore entitled to take the proceeds of the sale of those lots, remaining after the payment of Solon mortgage and John Miller's judgment. This is a legal right of which he cannot be deprived unless some superior equity is shown to be in another. If such equity exists it can only be enforced on equitable principles, and the most obvious is that its enforcement shall not work injustice to the creditor against whom it is invoked, the defendant or any other having equal rights. It can make no difference to the defendant to whom the money is paid, provided it is applied to the satisfaction of his indebtedness; nor does it affect the creditor if his claim is fully and promptly paid. We find, therefore, that the courts have recognized as an equity which will control the legal right of a creditor that he has two securities while the next subsequent creditor has but one. It has therefore been adopted as a rule of equity that " a person who can resort to two funds shall not by his option disappoint another who has a claim on one only: " Ramsey's App., 2 Watts, 228; Hasting's Case, 10 Watts, 303. But all the cases upon this subject recognize the right of the creditor to full and prompt payment of his claim, and it is obvious that any rule to the contrary would not only deprive him of a legal right, but would be unjust and inequitable, and, accordingly, the proceedings to administer such an equity have been made consistent with it. The ordinary means of enforcing such an equity is by subrogation or marshaling assets. As to subrogation, it has always been held that it cannot be ordered until the debt of the creditor against whom it is asked has been fully paid: Kyner v. Kyner, 6 Watts, 221; Graff's Est., 139 Pa. 69. Even tender of payment is not sufficient: Forest Oil Co.'s App., 118 Pa. 139.

In the marshaling of assets it is a necessary requisite that there should be two funds of a common debtor presently distributable: Bispham on Equity. Counsel for the petitioner admits that he is not in a position to demand subrogation, because Dulany's claim has not been paid, and there can be no conditional order of subrogation: Graff's Appeal, 139 Pa. 69; Forest Oil Co.'s App., 118 Pa. 139. And because there is a doubt as to the right of a mechanic's lien creditor to subrogation: Knouf's Appeal, 91 Pa. 78; Kendig v. Landis, 135 Pa. 612. We think, however, there are greater difficulties in applying to this case the principles recognized in marshaling assets. In the first place it is a mere modification of subrogation. It applies the principle of subrogation to funds in court instead of property held as security. "The two funds must actually exist. The doctrine of marshaling cannot be invoked for the purpose of raising a fund." Bispham on Eq. sec. 342. This is necessary to effect a full and immediate payment of the creditor's claim, which is a prerequisite to subrogation, and is applicable to marshaling assets as well. The petitioner in his first petition asked for a qualified order of subrogation. He afterwards filed a supplemental petition in which he asks that Dulany "be required to proceed upon his mortgage and resort to lot No. 28, and the proceeds of lots Nos. 148, 149 and 150, for the payment thereof, before he shall be entitled to participate in the distribution of the fund now in court in this cause, and that further distribution of the fund now in court be suspended in the mean time." In the argument counsel asks that distribution be suspended only as to the amount necessary to pay petitioner's claim, say $975. In other words, that the sum of $975 be impounded by the court until Dulany shall have proceeded upon his mortgage and exhausted the proceeds of the sale of lot No. 28.

This is not subrogation nor is it in regular course of marshaling assets. It does not ask the application of funds now in court, but that distribution of a fund in court be suspended until another fund shall have been created. This appears to be inequitable and unjust. The money is now in court, which is legally applicable to Dulany's claim. We are asked to withhold it from him for the reason that he may possibly be able to make it out of other property. This is uncertain. It may be

that the other property would not produce more than sufficient to pay the balance of his claims after the appropriation of the entire fund now in court. In that event the petitioner would take nothing by his motion, and Dulany would receive his own without interest. He would thus be deprived of the use of his money without compensation, to give the petitioner a chance to ascertain whether there might be a fund upon which he had no legal claim, but which might in equity be administered in his favor—a chance which might not be realized, as was the result in Morris v. Olwine, 22 Pa. 441. Counsel for petitioner thinks he finds authority for such action in the cases of Morris v. Olwine, 22 Pa. 441, Graff's Appeal, 139 Pa. 69, and Tubb's Appeal, 161 Pa. 252.

These cases seem to sustain the contention, but none of them decides the question. None of them was a case of a creditor having a single security, asking the court to compel another creditor to exhaust property upon which the first had no legal claim. In each of those cases the creditors asking protection had valid claims against the entire property, the only difference being that one had a prior lien upon part of the property. Morris v. Olwine, and Graff's Case were voluntary assignments for the benefit of creditors, and Tubb's Appeal, that of a decedent's estate, the contest being between general creditors and mortgagee. They did not present a mere question of equitable distribution, but the ascertainment of the value of specific liens. The language of the courts must be construed in reference to the facts then under consideration. Giving what was said the force of decisions, they do not decide the question now raised. But on examination, we find that the question was not decided. The language of the court relied on was in each case a dictum applicable to the facts of that case, and though of persuasive force, ought not to be considered as establishing a principle to be carried into other cases presenting a different state of facts.

In the case of Morris v. Olwine, 22 Pa. 441, Judge ALLISON made an order directing that a dividend awarded to a mortgage creditor out of a fund derived from personal property, should be placed with the Girard Ins. Co., at interest, until the mortgaged premises should be sold. This was certainly an extraordinary exercise of power. It not only suspended distribution, but ordered a loaning of the money. How

this was done, does not appear. No opinion is reported. It may have been by consent of parties.. It was unnecessary, as the same result could have been effected by permitting the mortgage creditor to take his dividend, which would have reduced the mortgage debt to that extent, and if the property was worth more than the amount remaining, the creditors would have received compensation by dividends out of the excess. We do not understand the Supreme Court, as approving this action. The court does say that " if the other creditors think the land is more than sufficient to discharge the liens, this may be ascertained in the way adopted by the court," but this remark relates to a fact accomplished, and does not necessarily approve it. The court expressly says " all that is at present decided is that the subsequent reduction of the debt, by proceedings on the mortgage does not deprive the creditor of the dividend thus previously ascertained. The final decree of the court of common pleas was correct and is therefore, affirmed." In Graff's case there was also an assignment for benefit of creditors, including real estate subject to two mortgages. It was however, complicated by the fact that the assignee had sold the real estate subject to the mortgages. It was sold to a syndicate of the general creditors. A large fund, about $185,000 had been derived from the general assets. The auditor appointed to make distribution awarded dividends to the mortgagees of $59,273.24 and $9,560 respectively, but recommended that, upon payment, they should assign to the assignee, for the benefit of the creditors, an equal amount of the mortgage securities. The court adopted this suggestion, with a slight modification. But the Supreme Court held that this could not be done, because it was an order of subrogation upon partial payment, in violation of the principle established by Kyner v. Kyner, 6 Watts, 221, which has since been uniformly adhered to, that there cannot be subrogation to the rights of a creditor who has not been fully paid. The Supreme Court, therefore, reverses the court below, and directed the payment of the dividends to the mortgaged creditors without condition. They, however, applied to the case of another well established principle, that, though payment discharges a lien at law, it does not necessarily do so in equity and may, therefore, be kept alive to subserve the purpose of equity. The result is practically the

same and there may be a distinction without a difference, but it tends to show the care of the courts to conform to established principles and recognized modes of enforcing them. In this case, the court below says: "We are of the opinion that the court has the power to withhold the payment of dividends to be awarded to them until there shall have been an exhaustion of the mortgaged property." And the Supreme Court says: "The appellants might, therefore, have been compelled to proceed upon their mortgages before coming on this fund." But this was not done by the court below, nor by the Supreme Court, possibly because as suggested by Justice MITCHELL, "it might have involved much hardship and possible risk." It is apparent that in this case, there would have been hardship and risk—$70,000 would have been withheld from parties who were entitled to it in law—they deprived of the use of it without compensation, and subject to the risk of failing banks or other contingencies, by which it might be wholly lost. In that case the court did not, and if so requested, probably would not, in view of apparent loss and risk, have ordered suspension of payment even in favor of parties having a legal claim against the property, much less at the request of one who had no legal claim and only a possible equity. In Tubb's Appeal, 161 Pa. 252, Judge RHONE citing Graff's Appeal, says: "Under this last cited case, it would have been our duty, if required, to have withheld the present fund from the Benscoters until after they had exhausted the land by a sale of the mortgage. But no such demand has been made." The question was, therefore, not considered, but the case was decided on other grounds. The case was affirmed by the Supreme Court without an opinion. We are of the opinion that these cases do not sustain petitioners' contention and in the absence of authority, we do not feel that we would be justified in exercising an extraordinary power in cases in which the equity is not clear.

But in Graff's Appeal, 139 Pa. 69, Justice MITCHELL says, "Subrogation never takes place to the prejudice of any other right," and this principle is applicable to the exercise of equitable power in all cases. The lots Nos. 99 and 100, on which petitioners had a lien, were sold on September 10, 1897, upon the Solon mortgage, which divested all liens, including Dulany's mortgage. On the next day, September 11, lot No. 28 was sold

upon a judgment of Wm. H. Gunther, subject to Dulany's mortgage, and was purchased by Mrs. Gunther, wife of the defendant, for $425. It is evident that if the petitioner is permitted to take $975 out of the fund appropriated to Dulany, that she will be compelled to pay that amount more than she would under the appropriation of the sheriff. We must therefore consider whether she has any equity to prevent it. When lot No. 28 was offered for sale the fact was that other property had been sold by the sheriff for a sum which, after payment of costs, the Solon mortgage and Miller judgment was in law applicable to the Dulany mortgage and operated as payment and satisfaction of it to that amount. This could be estimated with substantial accuracy, as the only uncertain element was the costs. A bidder at the sale of lot No. 28 would have a right to assume that the money made by the former sale would be appropriated in accordance with law, and that lot No. 28 would be subject to the balance of the Dulany mortgage and no more. Mrs. Gunther says that she was so informed by her attorney, who advised her of the probable amount. Counsel for the petitioner claims that this does not raise an equity in Mrs. Gunther, because the entries in the sheriff's office are not official records, and until a final return has been made the liens must be considered as they appear of record.· In support of this contention he cites Reading v. Hopson, 90 Pa. 494; Saunders v. Gould, 124 Pa. 237; Barlow v. Beall, 20 Pa. 178. These were all cases in which the effect of record notice was considered. They do not refer to the effect of actual knowledge or the right of parties to act upon such knowledge. It is a singular contention that parties attending a sheriff's sale could not act upon the facts occurring under their notice, but in such case must act as if nothing else had been done. We all know that this is not done, but that every sensible business man acts upon conditions as they exist, and employs attorneys to inform them of such matters as they may not understand. In this case Mrs. Gunther had a right to act on her information as to the sale of other property, and the advice of her attorney as to the application of the proceeds. She had a right to rely upon the legal effect of said sales, and was not bound to know that some equitable claim would be set up against it. If the petitioner intended to set up such a claim

it was his duty to notify her of the fact before she had incurred the liability: Snyder v. Crawford, 98 Pa. 414. This could have been done by notice to all bidders at the time of the sale, and thus all would have been on an equality, which was the purpose of the case which counsel cites. The petitioner did not do this, but on the contrary, became a bidder at the sale of lot No. 28, and gave no notice of his intention to affect the legal status of Dulany's mortgage until after Mrs. Gunther had made payment of the purchase money and the sheriff's deed had been executed. It is manifest that this was unjust to other bidders, and that the petitioner was not standing upon an equality with them. If he had become the purchaser it would have made no difference to him how the first fund should be appropriated; if paid to Dulany, it would relieve the lot purchased, and if not, it would pay his mechanic's lien. If he had purchased lot No. 28, this application would not have been made, the money would have been paid to Dulany and the mortgage on the lot reduced to that extent. It was only on the purchase by another that it became his interest to throw the burden upon the purchaser. It would be manifestly inequitable to permit him to do this. So that aside from the question as to petitioner's rights as against Dulany, he is clearly not entitled to the relief prayed for against Mrs. Gunther. The exceptions to the sheriff's return are therefore overruled, the sheriff's return affirmed, and he is directed to pay out the money accordingly."

A judgment in favor of David J. James for $893, the sum for which his lien was filed, being excluded from the schedule of distribution, said David J. James appealed.

*Errors assigned* were (1) in making the final decree, which was as follows: "January 5, 1898, exceptions to sheriff's return are overruled, and the sheriff's return affirmed, and he is directed to pay out the money accordingly." (2) In confirming the sheriff's special return absolutely, without granting any relief to D. J. James, lien creditor, petitioner and exceptant, upon his petition and supplemental petition. (3) In not granting D. J. James, the appellant, the relief prayed for in his supplemental petition, to wit: "That R. F. Dulany be required to proceed upon his said mortgage from Andrew Gunther, recorded in mortgage book, vol. 747, page 127, and resort to said lot No. 28

in Hawkins plan, and the proceeds of lots Nos. 148, 149 and
150 in the Hartwood plan, for payment thereof, before he shall
be entitled to participate in the distribution of the fund now in
court in this cause; and that further distribution be suspended
in the mean time."

*William Yost,* for appellant.—The mortgagee, R. F. Dulany,
should be required to exhaust lot No. 28, out of which his debt
for purchase money arose, and upon which he has a first lien,
before resorting to the only fund to which appellant can resort:
Graff's Estate, 139 Pa. 69.

The appellants might have been compelled to proceed upon
their mortgages before coming upon this fund: Kendig v.
Landis, 135 Pa. 612; Tubb's Appeal, 161 Pa. 252.

In Morris v. Olwine, 22 Pa. 441, the common pleas court
actually withheld a dividend of an assigned estate on the
creditor's bond until he exhausted his mortgage.

A subsequent creditor or purchaser does not acquire an
equity to deprive a mechanic's lien creditor of his rights to
compel a prior creditor to resort to that one of two funds on
which he alone has a lien: Kendig v. Landis, 135 Pa. 612;
Reading v. Hopson, 90 Pa. 494; Saunders v. Gould, 124 Pa.
237; Barlow v. Beall, 20 Pa. 178.

In purchasing, subject to Dulany's mortgage, Mrs. Gunther
is presumed to have paid as much as its amount less than she
would have done: Miners' Trust Co. v. Roseberry, 81 Pa. 309.

*J. T. Buchanan,* with him *T. L. Gartner,* for appellee, Mary
Gunther.

*A. B. Stevenson,* for appellee, R. F. Dulany.—Subrogation is
payment in full without conditions: Graff's Est., 139 Pa. 69;
Oil Co.'s Appeal, 118 Pa. 139; Ins. Co. v. Fidelity, 123 Pa. 523.

The doctrine of marshaling assets applies only to funds
presently distributable, already in existence, belonging to the
same debtor, and in court, as correctly found by Judge SLAGLE,
in his very learned, able and exceedingly painstaking opinion,
in this case. See also Taylor's Appeal, 81 Pa. 460.

The Supreme Court of Pennsylvania has uniformly and
always held, in a long line of cases, beginning with Taylor v.

Maris, 5 Rawle, 56 (1835), down to Hemperley v. Tyson, 170 Pa. 385 (1895), that where a creditor or mechanic's lien claimant, has an equitable claim or demand which he intends to demand against the legal status of an earlier lien creditor holding superior securities, that he is bound to give express notice, to the creditor holding prior liens or mortgages, warning him not to use his securities in any way to his injury.

If James ever had any equitable right of subrogation he lost it by his own laches as was held by this court in Seibert's Estate, 4 Pa. Superior Ct. 514, opinion by Pres. Judge RICE (April 19, 1897), citing Allegheny V. R. R. Co. v. Dickey, 131 Pa. 86.

OPINION BY RICE, P. J., October 10, 1898:

Andrew Gunther bought of R. F. Dulany a lot, which for convenience may be designated as the Hawkins property, and, to secure payment of the purchase money, gave a mortgage thereon, and on other lots owned by him, which may be designated as the Hartwood property. Afterwards D. J. James erected for Gunther a building on two of the lots embraced in the Hartwood property, and filed a mechanic's lien against the same for $847. This lien related back to the date of the commencement of the building, May 21, 1896. On September 10, 1897, the Hartwood property was sold at sheriff's sale under proceedings on a prior mortgage, and, under the act of April 10, 1862, relating to the distribution of the proceeds of sheriff's sales in Allegheny county, the sheriff reported a schedule of distribution, in which the balance remaining ($1,927.57) after satisfying earlier liens was awarded to R. F. Dulany. On the following day (September 11, 1897), the Hawkins property was sold at sheriff's sale under a fi. fa. issued by W. H. Gunther, and was purchased by Mary Gunther for $425. The lien of Dulany's mortgage was not divested by this sale. She complied with her bid, and a sheriff's deed was prepared and ready for delivery, but before it was actually delivered D. J. James presented a petition, of which Mrs. Gunther had notice, praying that R. F. Dulany be compelled to resort to the Hawkins property for the payment of his mortgage before being allowed to participate in the distribution of the fund realized from the sale of the Hartwood property, and that distribution of that fund be suspended in the mean time. Testimony was

taken and upon consideration thereof the court refused this petition and confirmed the distribution reported by the sheriff. This decision was put on two grounds, first because it would be inequitable, and unjust to Dulany, to suspend distribution until another fund should have been created; second because it would be inequitable as against Mrs. Gunther, the purchaser at the second sale.

As to the first ground the learned judge says : " The money is now in court which is legally applicable to Dulany's claim. We are asked to withhold it from him for the reason that he may possibly be able to make it out of other property. This is uncertain. It may be that the other property would not produce more than sufficient to pay the balance of his claim after the appropriation of the entire fund now in court. In that event the petitioner would take nothing by his motion, and Dulany would receive his own without interest. He would thus be deprived of the use of his money without compensation, to give the petitioner a chance to ascertain whether there might be a fund upon which he had no legal claim, but which might in equity be administered in his favor—a chance which might not be realized, as was the result in Morris v. Olwine, 22 Pa. 441." The rule that a party having two funds to satisfy his demand shall not, by his election, disappoint a party who has only one fund is "founded in benevolence and regulated in its application by the nicest principles of justice." The rule is never enforced to defeat a superior or even equal right of another. Where both funds are in court or under its control, the enforcement of this equity cannot, ordinarily, work injury to the paramount creditor. Kendig v. Landis, 135 Pa. 612, was such a case. But where the proposition is to suspend distribution of the fund in the grasp of the court until another fund shall be created, the burden of proof is cast on the junior creditor who invokes this extraordinary exercise of power to show that the paramount creditor will not suffer loss by the delay. The doubts expressed by the learned judge upon this point are not wholly without foundation in the evidence. Not only was there the possibility that the Hawkins property in its condition at that time would not bring enough to save Dulany from loss by the delay, but there was also the risk of the destruction of the buildings by fire, in which case it certainly would not. In

a leading case upon the subject it was said that substitution cannot be made as long as the debt of the prior creditor remains unsatisfied, though it be in part only; " for " said KENNEDY, J., " until he shall be wholly satisfied, there ought and can be no interference with his rights or securities, which might even by bare possibility, prejudice or embarrass him in any way in the collection of the residue of his claim. Now it is obvious, that such interference cannot be avoided or guarded against with certainty, except it be by the court's refusing to substitute upon any terms whatever, as long as any part of the elder creditor's claim remains unpaid : " Kyner v. Kyner, 6 W. 221.

The reason for this rule—which it is conceded is now too firmly fixed to be disturbed (Graff's Estate, 139 Pa. 69),—applies with equal if not greater force to an application to restrain the prior creditor from participating in the distribution of a fund in court until after he shall have proceeded upon his security and raised up a second fund by the sale of another property ; more especially if such application was not made, and he had no notice that it would be made, before the sale of the property doubly charged. This method of enforcing the equity of a junior incumbrancer is, to say the least, extraordinary, as the learned judge of the court below has well shown. The general rule in this country is as stated by Mr. Bispham, " that the right of marshalling is usually enforced through the equities of subrogation and contribution : " Bisph. Eq. (2d ed.) sec. 341. There are exceptions to this general rule it is true ; but if the prior incumbrancer has neither done nor omitted anything which, having regard to the rights of the junior incumbrancer, he ought not to have done or omitted, and the junior incumbrancer has neglected to move or even give notice of his intention until after the land doubly charged has been sold by the sheriff, and the fund is ready for distribution, we think the general rule applies. If, as the case then stands, the enforcement of his equity in the mode here insisted upon would certainly delay the prior incumbrancer, and possibly subject him to loss, it would be inequitable to compel him to take the risk. It ought to be cast on the junior incumbrancer and he should be left to enforce his equity, if he has any, in the usual mode. See Graff's Estate, 139 Pa. 69. In this view of the case it is unnecessary to decide, whether or not, under the circumstances, it

would be inequitable, as against Mrs. Gunther, to grant the relief prayed for or similar relief; and as there is a serious dispute as to the action of the appellant at the second sale, we deem it advisable to express no opinion upon the question, further than to say, that, assuming the fact to be as stated in the opinion of the learned judge of the court below, we see no reason to doubt the correctness of his conclusion.

The decree is affirmed, and the appeal is dismissed at the costs of the appellant.